UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA, Ex. Rel.
CHRISTOPHER DAVERN,

Plaintiff,

DECISION AND ORDER

-vs-

11-CV-6630 CJS

HOOVESTOL, INC.,

Defendant.
_____

APPEARANCES

For Plaintiff:                     Jill K. Schultz, Esq.
                                   David L. Rasmussen, Esq.
                                   Davidson Fink LLP
                                   28 East Main Street, Suite 1700
                                   Rochester, New York 14614

                                   Reid A. Holter, Esq.
                                   117 West Main Street
                                   Victor, New York 14564

For Defendant:                     Christopher D. Thomas, Esq.
                                   Nixon Peabody LLP
                                   Clinton Square, P.O. Box 31051
                                   Rochester, New York 14603

                                   David P. Hendel, Esq.
                                   Hal J. Perloff, Esq.
                                   Husch Blackwell LLP
                                   750 17th Street NW, Suite 900
                                   Washington, D.C. 20006

                                   Edward D. Manzo, Esq.
                                   Husch Blackwell Sanders Welsh & Katz
                                   120 South Riverside Plaza, Suite 2200
                                   Chicago, Illinois 60606

INTRODUCTION

This is a *qui tam* action brought pursuant to the False Claims Act ("FCA"), 31 U.S.C. § § 3729-3733, by relator Christopher Davern ("Relator" or "Davern"), who maintains that his employer, a trucking firm, defrauded the U.S. Postal Service ("USPS").  The United States has elected not to intervene in the action.  Now before the Court are  Defendant Hoovestol, Inc.'s ("Defendant" or "Hoovestol") motions to unseal the record and to dismiss the Second Amended Complaint pursuant to Fed.R.Civ.P. 9(b) & 12(b)(6).  (Docket Nos. [#46] & [#48]).  The motion to unseal is granted and the motion to dismiss is granted in part and denied in part.

BACKGROUND

For purposes of the instant motion, the Court is required to assume the truth of the factual allegations in the Second Amended Complaint [#42] and the documents attached thereto.  Unless otherwise noted, those facts are as follows.  Hoovestol is a trucking company, and Davern is a truck driver employed by Hoovestol.  Between 2001 and the filing of this action, USPS and Hoovestol entered into  "a series of contracts" for the transportation of mail between Rochester, New York and Springfield, Massachusetts ("the Rochester-Springfield route").  Hoovestol and USPS also have contracts for many other routes, but the Rochester-Springfield route is the only route with which Davern is personally familiar, from having driven that route since 2001.

As part of USPS's contracting process for mail trucking routes, "highway carriers" such as Hoovestol submit a form entitled PS Form 7463A, "Negotiated Cost Statement Highway Transportation Contracts" ("Form 7463A").  The form has several columns, each containing twenty types of "cost" associated with USPS Highway Transportation Contracts.

In pertinent part, three of those cost items are "Fuel," "Tolls" and "Straight Time."  Although the Second Amended Complaint is not explicit on this point, the clear and reasonable inference from the pleading is that, during the process which resulted in USPS awarding the Rochester-Springfield route to Hoovestol, Hoovestol was required to list its specific costs for nineteen categories referenced on Form 7463A, or a similar form.[1]  As already noted, such costs included costs for tolls and payroll that would be incurred in performing the Rochester-Springfield route.  Although the original contract documents are not before the Court, presumably, when Hoovestol listed its costs in or about 2001, it indicated that its annual toll costs would be whatever the published toll charges were for a truck to travel between Rochester and Springfield at that time, multiplied by the number of annual trips that it expected to make pursuant to the contract.

Davern began driving the Rochester-Springfield route for Hoovestol in 2001, shortly after USPS awarded the contract to Hoovestol.  According to Davern, at around that same time, Hoovestol's management devised a plan to avoid having to pay almost all of the toll charges for the Rochester-Springfield route.  Such plan involved having one tractor trailer truck leave Rochester and another tractor trailer truck leave Springfield, and then having the two trucks meet at the Herkimer exit of the New York State Thruway, in a parking area on the highway-side of the toll booths, where the drivers would exchange trucks.  Then, each truck would return to its starting point, but exit the toll road one exit from the exit where it originally entered the highway, making it appear that each truck had only traveled

---

[1]This is evident, since as discussed further below, Hoovestol later sought to amend those figures, and there could be no such amendment unless there were original "baseline" figures.

one exit on the respective toll road.[2]   Davern contends, though, that Hoovestol never notified USPS that it had found a way to avoid paying the tolls.

Davern further contends that when Hoovestol initially completed the form listing its costs for the Rochester-Springfield route, it indicated that each run would take 7.25 hours to complete.  However, Davern contends that it actually took only about 6.5 hours to complete each run.  Davern alleges that Hoovestol never notified USPS that it only took 6.5 hours to complete each run.  Further, Davern contends that Hoovestol directed him to falsely indicate in his "log book" that each run took him 7.5 hours to complete.

Additionally, Davern indicates that Hoovestol had a particular identification number assigned to each route that it operated for USPS, and that whenever a Hoovestol driver purchased truck fuel, he would indicate the identification number for the route that he was driving.  Davern maintains, however, that on the Rochester-Springfield route, Hoovestol would sometimes direct him to use a different route's identification number when purchasing fuel.

Between 2001 and 2007, it is unclear what documents, if any, were exchanged between Hoovestol and USPS concerning costs for the Rochester-Springfield route.  It appears, though, that during such period Hoovestol updated its cost figures for the Rochester-Springfield route at least once, perhaps in connection with the execution of a new contract.  That appears to be the case because on May 27, 2009, Hoovestol's President, Wayne Hoovestol, signed a Form 7463A, purporting to detail the difference between the "last approved cost as of 09/30/07" and the "negotiated effect cost as of

---

[2]Each driver had his own EZ Pass toll device, which he would keep with him.

4

07/01/09."  The form refers to "Contract No. 14018," which is apparently the contract that was in place at the time between USPS and Hoovestol for the Rochester-Springfield run. The aforementioned Form 7463A, which Davern attached to his pleading, indicated that between September 2007 and May 2009, the cost-per-trip for tolls had increased from $48 to $54.44.  The form continued to indicate that Hoovestol spent 7.25 hours per run, but further stated that Hoovestol's straight-time payroll costs had increased from $18.21 per hour to $19 per hour, with an accompanying increase in costs for hourly-based fringe benefits.  The form did not, however, indicate any change in the units of fuel or the cost per unit of fuel.

Davern contends that Hoovestol submitted that Form 7463A to USPS on May 27, 2009, because it was seeking an increase in payment under the contract for tolls and payroll-related costs.  That is, Hoovestol indicated that its costs for tolls and driver pay had increased, because it wanted additional compensation from USPS.  Davern maintains, therefore, that the submission of such Form 7463A was a claim for payment, and that such claim was false and fraudulent, since it misrepresented the amount of tolls that Hoovestol was actually incurring, and overstated the number of hours that its drivers were spending on the route.  Davern also contends that the form was false because it did not accurately reflect the amount of fuel that Hoovestol was using on the Rochester-Springfield route. Davern asserts that in addition to submitting Form 7463A, Hoovestol "submitted [additional] claims for compensation for additional trips taken prior to Christmas each year on an 'as needed' basis," which incorporated the fraudulent cost figures.[3]  Davern speculates that

---

[3]Pl. Memo of Law [#49] at p. 2.

5

Hoovestol similarly overstated its costs with respect to other routes for which it had contracts with USPS.

On December 23, 2011, Davern commenced this action, pursuant to 31 U.S.C. § 3730(b).  In accordance with 31 U.S.C. § 3730(b)(2), Davern filed the action "*in camera*" and served a copy of the complaint on the U.S. Government, for its consideration. *See, id.* ("The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.").  Subsequently, the Government filed six (6) separate applications under 31 U.S.C. § 3730(b)(3), for extensions of time to consider whether to intervene,  which the Court granted.  Eventually, on March 11, 2015, the Government decided not to intervene.  That same day, the Court signed an Order (Docket No. [#23]) drafted by the Government, unsealing the pleading and all other documents filed "*after* the date of th[e] Order." (emphasis added).  Thereafter, Davern served the Amended Complaint [#19] on Hoovestol.

On July 16, 2015, Hoovestol filed a motion [#34] to dismiss the Amended Complaint.  On August 5, 2015, Davern responded by filing a Second Amended Complaint [#42], thereby mooting the motion to dismiss.  On August 19, 2015, Hoovestol responded by filing the subject motion [#46] to dismiss the Second Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).  Then, on September 22, 2015, Hoovestol filed the subject motion [#48] to unseal the entire docket.

Davern opposes the motion to dismiss and maintains that he has pleaded his claims (on behalf of the Government) with particularity.  Specifically, Davern contends that he has stated claims under three sub-sections of the FCA: 31 U.S.C. § 3729(a)(1)(A) ("knowingly presents, or causes to be presented, a  false or fraudulent claim"); 31 U.S.C.

§ 3729(a)(1)(B) ("knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"); and 31 U.S.C. § 3729(a)(1)(G) ("knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government").

The Government, meanwhile, opposes Hoovestol's motion to unseal the entire docket.  In that regard, the Government maintains that documents it filed under seal prior to making its decision not to intervene, consisting primarily of its requests for extensions of time in which to evaluate the claim, should remain sealed, because they  contain sensitive information concerning the Government's internal investigative and decision-making processes. *See*, Docket No. [#52].

On October 29, 2015, counsel for the parties appeared before the undersigned for oral argument of the motions.

DISCUSSION

The Motion to Unseal

The Government maintains that all documents that it filed in this action prior to March 11, 2015 should remain sealed, but the Court disagrees.   31 U.S.C. § 3730 does *not* envision that documents filed in a *qui tam* action will remain sealed permanently. Instead, the statute indicates that the complaint should remain sealed during the initial sixty-day period in which the Government is given to evaluate the case, as well as during any additional periods granted by the Court for that purpose. 31 U.S.C. § 3730(b)(2)-(3). However, in *qui tam* actions the Government frequently seeks to permanently seal its

7

submissions, filed during the period in which it is investigating whether it should intervene.

In similar cases, courts have placed the burden on the Government to demonstrate

that continued sealing is appropriate:

> The Government's opposition to the unsealing of the record is [typically] premised on two arguments: (1) that details relating to the Government's underlying investigation should be left under seal as privileged, attorney work-product; and (2) that the documents in question should be left under seal because they contain information protected by the government's law enforcement/investigatory files privilege.

> In general, other courts faced with this issue have considered lifting the seal on the entire record to be appropriate unless the Government shows that such disclosure would: (1) reveal confidential investigative methods or techniques; (2) jeopardize an ongoing investigation; or (3) harm non-parties. However, if the documents simply describe routine or general investigative procedures, without implicating specific people or providing substantive details, then the Government may not resist disclosure. When evaluating a motion to lift the seal, courts are also to consider the interests of the public, since court records are typically expected to be open to the public.

> Thus, under the applicable standard, neither the assertion of the attorney-work product privilege nor the assertion of the litigation/investigative privilege is an absolute bar to the disclosure of documents relating to past or current Government investigations.

*U.S. ex rel. Lee v. Horizon W., Inc.*, No. C 00-2921 SBA, 2006 WL 305966, at *2-3 (N.D.

Cal. Feb. 8, 2006) (citations omitted).

Here, the Government suggests that its filings prior to March 11, 2015 should

remain sealed,  to "protect the government's investigative processes," to "guard against

premature disclosure of sensitive criminal investigations," and to protect "attorney work

product." However, the Government is not conducting an ongoing investigation. Moreover,

the Government's filings contain only general references to its efforts to investigate the

case.  For example, in one application for an extension of time [#5-1], the Government indicated that its investigation included obtaining toll records from "New York State E-Z Pass."  In another such application [#10-1], the Government indicated that "[i]nterviews of several [unnamed] drivers have been conducted."  In another such application [#14-1], the Government indicated that it was having settlement discussions with Hoovestol.  This type of vague information does not need to be kept under seal, though it also probably has no value whatsoever to Hoovestol.  In any event, Hoovestol's application to unseal [#48] is granted.

Motions to Dismiss Pursuant to FRCP 12(b)(6) & 9(b)

The general legal principles concerning motions under FRCP 12(b)(6) are well settled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

> First, although a court must accept as true all of the allegations contained in a complaint,[4] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).  "The application of this 'plausibility' standard to particular cases is 'context-specific,' and requires assessing the allegations of the complaint as a whole." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Retirement Plan v. Morgan Stanley Inv. Management Inc.*,  712 F.3d 705, 719 (2d Cir. 2013) (citation and internal quotation marks omitted).

It is of course well-settled that in resolving a 12(b)(6) motion, the Court is limited as to what it can consider. *See, Vasquez v. City of New York*, No. 10 Civ. 6277(LBS), 2012 WL 4377774 at *1 (S.D.N.Y. Sep.24, 2012). (On a 12(b)(6) motion, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, ...

---

[4]The Court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), *cert. den.* 531 U.S. 1052, 121 S.Ct. 657 (2000).

matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (*quoting Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).").

Additionally, since the instant action involves alleged fraud, the Complaint must comply with Fed.R.Civ.P. 9(b), which requires, *inter alia*, that "a party must state with particularity the circumstances constituting fraud."

> To satisfy this requirement, a plaintiff should specify the time, place, speaker, and content of the alleged misrepresentations.  In addition, the complaint should explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.

*Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (citations and internal quotation marks omitted).  Particularly as to FCA claims,

> Rule 9(b) does not impose a 'one size fits all' list of facts that must be included in every FCA complaint.  This is a fact-specific inquiry.
> ***
> Courts in this Circuit have held that to satisfy Rule 9(b), an FCA claim must allege the particulars of the false claims themselves, and that allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity.  Accordingly, both the fraudulent scheme and the submission of false claims must be pled with a high degree of particularity.

> In reaching this conclusion, courts have looked to the pleading requirements of Rule 9(b) and the intent of the FCA.  . . .  Under the FCA, liability attaches not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.  Accordingly, FCA pleadings are inadequate unless they are linked to allegations, stated with particularity, of actual false claims submitted to the government that constitute the essential element of an FCA qui tam action.

> [T]he submission of a claim is the *sine qua non* of a False Claims Act
> violation.  As such, Rule 9(b)'s directive that the circumstances constituting
> fraud or mistake shall be stated with particularity does not permit a False
> Claims Act plaintiff merely to describe a private scheme in detail but then to
> allege simply and without any stated reason for his belief that claims
> requesting illegal payments must have been submitted, were likely submitted
> or should have been submitted to the Government.  If Rule 9(b) is to be
> adhered to, some indicia of reliability must be given in the complaint to
> support the allegation of an actual false claim for payment being made to the
> Government.

*U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 508-510 (S.D.N.Y. 2014)

(citations and internal quotation marks omitted except as indicated).  At the same time,

even in FCA cases,

> [i]t is only common sense that the sufficiency of pleadings under Rule 9(b)
> may depend upon the nature of the case, the complexity or simplicity of the
> transaction or occurrence, the relationship of the parties and the
> determination of how much circumstantial detail is necessary to give notice
> to the adverse party and enable him to prepare a responsive pleading.

*In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) (citations and

internal quotation marks omitted).

According to Davern,[5] the Second Amended Complaint [#42] adequately alleges

that Hoovestol violated 31 U.S.C. § 3729(a)(1)(A), (B) & (G)[6] by creating a fraudulent cost

statement, submitting it to USPS for increased payment under the contract, and then

retaining the fraudulently-obtained payments.  More specifically, Davern alleges that

Hoovestol lied about its costs for tolls, payroll and fuel, with regard to the Rochester-

---

[5]*See*, Plaintiff's Memo of Law [#49] at p. 10.

[6]At oral argument, the Court confirmed with Davern's counsel that these are the sections under
which Davern is attempting to assert claims.

Springfield route and other routes.  However, the Court agrees with Hoovestol that the Second Amended Complaint fails to plausibly state a claim concerning fuel.  In that regard, the pleading indicates that Hoovestol assigned identification numbers to each delivery route for fuel accounting purposes, and would sometimes use other routes' identification numbers when purchasing fuel for the Rochester-Springfield route.  The pleading, though, does not plausibly allege with particularity that Hoovestol did so in order to defraud the government in violation of the FCA.  For example, although Davern's theory is that Hoovestol exaggerated its costs in order to increase the amount that it was paid, the pleading suggests that Hoovestol understated, not overstated, its actual fuel usage on the Rochester-Springfield route.  Consequently, the pleading fails to explain how Hoovestol's alleged misuse of fuel identification numbers was fraudulent.

The pleading also fails to plausibly allege with particularity that Hoovestol committed fraud with regard to any route besides the Rochester-Springfield route.  Instead, the pleading merely makes conclusory assertions about other routes "upon information and belief," without explaining the basis for such belief.  Accordingly, Davern's claims concerning delivery routes other than the Rochester-Springfield route are inadequately pled.  Having made those preliminary determinations, the Court will consider whether the pleading's remaining allegations, concerning tolls and payroll information for the Rochester-Springfield route, adequately plead a violation of 31 U.S.C. § § 3729(a)(1)(A), (B) or (G).

<u>31 U.S.C. § §  3729(a)(1)(A) & (B)</u>

To plead a claim under 31 U.S.C. § 3729(a)(1)(A), the complaint must allege that: (1) there was a false or fraudulent claim, (2) the defendant knew it was false

or fraudulent, (3) the defendant presented the claim, or caused it to be presented, to the United States, and (4) it did so to seek payment from the federal treasury.

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 328 (S.D.N.Y. 2014) (citations omitted).   On the other hand, to plead a claim under 31 U.S.C. § 3729(a)(1)(B), the complaint must allege that: "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false or fraudulent claim." *Id*. (citation omitted).   Under either  § 3729(a)(1)(A) or  § 3729(a)(1)(B), the pleading must allege with particularity that an actual false claim was submitted to the Government. *See, U.S. ex rel. Kester v. Novartis Pharm. Corp.*, No. 11 CIV. 8196 CM, 2014 WL 2619014, at *5 (S.D.N.Y. June 10, 2014) ("[P]roof of a false claim is an essential element of both subsection (a)(1)(A) and (a)(1)(B) claims.").

Hoovestol maintains that the pleading fails to state a claim under either of these sub-sections, because there are insufficient facts alleged to show that Hoovestol ever submitted a false claim for payment to the Government.  Hoovestol argues, for example, that PS Form 7463A is not itself a request for payment, and that Davern has not pleaded how, when, or where Hoovestol submitted any other specific request for payment. Hoovestol further maintains that its contract with USPS was a fixed-rate contract, and that its actual costs accordingly would have been irrelevant to how much it was paid under the contract.   Hoovestol suggests, therefore, that the May 2009 cost statement was not material to any payments that it received.   Hoovestol further asserts that the figures contained in Form 7463A could not have been fraudulent, since they were merely intended to be estimates of future costs.

Hoovestol will certainly have an opportunity to disprove Davern's claims on the merits at the appropriate time.  However, at this pleading stage the Court finds that the Second Amended Complaint plausibly pleads fraud claims with particularity under 31 U.S.C. § 3729(a)(1)(A) & (B).  In that regard, the pleading plausibly indicates that while Hoovestol and USPS had a contract, Hoovestol's payment thereunder could be affected by its actual costs.  Davern's contention, that Hoovestol submitted Form 7463A to USPS in May 2009 as a claim for increased payment, based upon increased toll and wage costs, is plausible, particularly in light of 39 U.S.C. § 5005, which allows mail carrier contract payments to be adjusted based upon changed carrier costs.  Specifically, that section of law of which the Court takes judicial notice, entitled "Mail transportation," states in pertinent part:

> (a) The Postal Service may obtain mail transportation service  . . . (3) by contract from any person or carrier for surface and water transportation under such terms and conditions as it deems appropriate, subject to the provisions of this section.
>
> (b)(1) Contracts for the transportation of mail procured under subsection (a)(3) of this section shall be for periods not in excess of 4 years (or such longer period of time as may be determined by the Postal Service to be advisable or appropriate) and shall be entered into only after advertising a sufficient time previously for proposals. *The Postal Service, with the consent of the holder of any such contract, may adjust the compensation allowed under that contract for <u>increased or decreased costs </u>resulting from changed conditions occurring during the term of the contract.*

39 U.S.C.A. § 5005(a)-(b)(1) (West 2015) (emphasis added).  The Court is also aware of federal administrative decisions which refer to USPS's policy of allowing "economic pay adjustments" for mail transport contractors, based on increased costs. *See, e.g., Appeal*

*of Crowbar, Inc.*, 91-2 BCA P 23825, PSBCA No. 2729, 1991 WL 32267 (Postal Service Board of Contract Appeals Feb. 27, 1991) ("[USPS's] expressed policy for economic pay adjustments is to allow for an adjustment in compensation when changed economic conditions occur over which the contractor has little or no control.") (citation omitted).

Moreover, while Hoovestol maintains that the figures set forth on Form 7463A were merely estimates, Davern contends that those figures were supposed to reflect actual costs, which is supported by various publicly-available USPS documents, including Management Instruction MI PM-4.4.1-2005-1, "Economic Pay Adjustments for Highway and Inland Domestic Water Contracts" attachment.[7]  That document, of which the Court takes judicial notice,[8] indicates, in pertinent part, that "New or increased toll fees are allowable *when incurred*." (emphasis added).[9]  USPS documents also suggest that even so-called "fixed-price" highway carrier contracts may allow adjustments based on increased costs.  *See, id.* ("Fixed-price contracts:  In those instances where the Postal Service and the supplier enter into a fixed-price contract, risk related to increased costs, *except as*

---

[7] *See*, http://about.usps.com/management-instructions/welcome.htm

[8] Courts have taken judicial notice of information contained in USPS publications. *See, Liu v. United States*, 93 Fed. Cl. 184, 191 n. 7 (2010) ("[T]he Court takes judicial notice of the statements appearing on the USPS website regarding business days for the Postal Service.") (citation omitted); *Bokman v. C.I.R.*, No. 14105-99S, 2001 WL 1922767, at *3 (U.S. Tax Court Sept. 5, 2001) ("We take judicial notice of the U.S. Postal Service's Publication 201, Consumer's Guide to Postal Services & Products, a portion of which petitioner attached to her trial memorandum."); *Lewis v. Sec'y, DOC*, No. 2:10-CV-547-FTM-29, 2013 WL 5288989, at *6 (M.D. Fla. Sept. 19, 2013) ("The Court is satisfied that the material contained in the United States Postal Operations Manual, The United States Postal Service Administrative Support Manual, and the Florida Administrative Code contain adjudicative facts that are "not subject to reasonable dispute" and are "capable of accurate and ready determination." Accordingly, the Court takes judicial notice of these documents.") (citation omitted), *aff'd sub nom. Lewis v. Charlotte Corr. Inst. Employees*, 589 F. App'x 950 (11th Cir. 2014).

[9] *See also*, USPS Management Instruction PO-530-97-1 ("Form 7463, Cost Statement- Highway Transportation Contracts, is designed to identify the contractor's operating cost items at the beginning and ending of the period for which an adjustment is requested. To receive consideration for an adjustment in compensation, the contractor must provide documented evidence of *actual increased costs* on those items requiring documentation.").

*specified in the contract*, will be the responsibility of the supplier.") (emphasis added).

Hoovestol nevertheless insists that this claim fails because Davern has not identified an actual request for payment or reimbursement.  However, Davern has plausibly indicated that the May 2009 Form 7463A constitutes Hoovestol's request for increased payment, or at least an integral part of such a request.  In that regard, USPS Form 7463A is used to justify economic adjustments under highway mail carrier contracts,[10] and Hoovestol's May 2009 form details increased costs for tolls and wages, apparently for the purpose of seeking increased payment.  No other reason has been suggested for why Hoovestol would have submitted the form to USPS at that time.  To the extent that Hoovestol may have submitted some additional particular document to USPS to obtain a specific payment, Davern's failure to identify or produce that document is not fatal to the claim at this stage of the litigation, particularly since Davern, as a truck driver, would not be expected to have access to Hoovestol's billing records. *See, United States ex rel., United Union of Roofers v. City of Chicago*, No. 12 CV 7299, 2014 WL 6306582, at *3 (N.D. Ill. Nov. 12, 2014) ("At this early stage of the litigation, 'a relator need not produce a copy of the actual document making the false claim.' *Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 838 (7th Cir.2013); *see also [U.S. ex rel] Lusby [v. Rolls-Royce Corp.]*, 507 F.3d [849,] 854 [(7th Cir. 2009)] ('We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit.'). 'To say that fraud has been pleaded with particularity is not to say that it has been proved (nor is proof part of the pleading

---

[10] *See*, USPS Management Instruction PO-530-97-1 ("Form 7463, Cost Statement- Highway Transportation Contracts, is designed to identify the contractor's operating cost items at the beginning and ending of the period for which an adjustment is requested.  To receive consideration for an adjustment in compensation, the contractor must provide  documented evidence of actual increased costs on those items requiring documentation.").

requirement).' *Lusby*, 507 F.3d at 855."); *see also, In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. at 334 ("[C]ourts have held that Rule 9(b)'s heightened pleading standard may be applied less stringently when the specific factual information is peculiarly within the defendant's knowledge or control.") (citation omitted); *but see, U.S. ex rel Corporate Compliance Assocs. v. New York Soc. for the Relief of the Ruptured and Crippled*, No. 07 Civ. 292(PKC), 2014 WL 3905742 at *13-16 (S.D.N.Y. Aug. 7, 2014) (Arguing that in the FCA context, Rule 9(b) "requires [the plaintiff to plead] the dates that the claims were submitted, the amounts charged in the claims, their allegedly false contents and the defendants' standard billing practices.").

Alternatively, even assuming *arguendo* that the May 2009 Form 7463A is not itself a claim for payment, for the same reasons already discussed Davern has alleged, plausibly and with particularity, that the form  was a "false record or statement material to a false or fraudulent claim," and that Hoovestol made a false claim supported by the form.  For all of the foregoing reasons, Hoovestol's motion to dismiss the claims under 31 U.S.C. § 3729(a)(1)(A) & (B), pertaining to tolls and payroll costs on the Rochester-Springfield route, is denied.

<u>31 U.S.C. § 3729(a)(1)(G)</u>

This sub-section is sometimes referred to as the "reverse false claims" provision, because it pertains to the situation where a defendant uses a false record or statement not to obtain payment from the Government, but to avoid making a payment to the Government.[11]  "A claim under section 3729(a)(1)(G) requires (1) that the defendant had

---

[11]*See*, 31 U.S.C. § 3729(a)(1)(G) (Applicable to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to *an obligation to pay or transmit money or property to the Government*, or knowingly conceals or knowingly and improperly avoids or decreases *an*

an obligation to pay money to the government, (2) that the defendant used a false statement to avoid or decrease that obligation, (3) that the false statement was material, and (4) that the defendant made the false statement knowingly." *U.S. ex rel. Guth v. Roedel Parsons Koch Blache Balhoff & McCollister*, No. CIV.A. 13-6000, 2014 WL 7274913, at *7 (E.D. La. Dec. 18, 2014) (citation omitted), *aff'd*, No. 15-30043, — Fed.App'x. — , 2015 WL 5693302 (5th Cir. Sept. 29, 2015).

Hoovestol maintains that the pleading fails to state such a claim, in part, because it "fail[s] to identify with particularity any such [repayment] obligation Hoovestol allegedly owe[d] USPS," and "identifies no statute, regulation, or contractual provision that allegedly require[d] Hoovestol to make payments to USPS."[12]  The Court agrees with Hoovestol, inasmuch as the Second Amended Complaint fails to allege any instance in which Hoovestol allegedly committed fraud to avoid transmitting money or other property to the Government.  The pleading also fails to identify any instance in which the Government requested or demanded that Hoovestol repay money.

Davern nevertheless contends that a claim is pleaded under this sub-section, because Hoovestol fraudulently obtained payments from USPS, and then failed to repay them.  However, if the Court were to adopt Davern's construction of § 3729(a)(1)(G), it would mean that any time a defendant violated sub-sections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate sub-section (G) if it failed to repay to the Government the fraudulently-obtained payments.  Other courts have rejected that interpretation of subsection § 3729(a)(1)(G). *See, e.g., United States, ex rel. Besancon v.*

_____

*obligation to pay or transmit money or property to the Government.*") (emphasis added).

[12]Defendant's Reply Memo of Law [#54] at p. 17.

*Uchicago Argonne, LLC*, No. 12 C 7309, 2014 WL 4783056, at *4 (N.D. Ill. Sept. 24, 2014) ("[U]nder Relator's theory whenever there is a violation under § 3729(a)(1)(A) for a defendant's receipt of payment of a false claim, there would also be a violation of § (a)(1)(G) for failing to return the overpayment. That, of course, would make § (a)(1)(G) redundant to § (a)(1)(A), which is not the intent of the statute."); *see also*, *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 97 (D.D.C. 2014) ("[B]y this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement actionable under sections 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money.  . . .   And of course, if the conduct that gives rise to a traditional presentment or false statement action also satisfies the demands of section 3729(a)(1)(G), then there would be nothing "reverse" about an action brought under that latter section of the FCA."); *U.S. ex rel. Ligai v. ETS-Lindgren Inc.*, No. CIV.A. H-112973, 2014 WL 4649885, at *13 (S.D. Tex. Sept. 16, 2014)("As prior cases have noted when similar claims have been asserted, Ligai's reverse-false claim alleges a failure to refund the false claims the government paid. In such a case, courts have held that the plaintiff "is merely recasting his false statement claim under [§ 3729(a)(1)(C) ]. This type of redundant false claim is not actionable under subsection [ (a)(1)(G) ].") (citations omitted, brackets in original), *aff'd sub nom. U.S. ex rel. Ligai v. ESCO Technologies, Inc.*, 611 F. App'x 219 (5th Cir. 2015).   This Court likewise rejects such an interpretation, and finds that the pleading fails to state a claim under § 3729(a)(1)(G).

## CONCLUSION

Defendant's motion to unseal the docket [#48] is granted.  Defendant's motion to

dismiss [#46] is granted in part and denied in part.   The application to dismiss is granted without prejudice as to the claim under 31 U.S.C. § 3729(a)(1)(G), and as to any claims involving fuel and routes other than the Rochester-Springfield Route.   The motion to dismiss is otherwise denied.   Defendant is directed to answer the Second Amended Complaint within twenty (20) days of the date of this Decision and Order.

So Ordered.

Dated: Rochester, New York
       November 6, 2015

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge